1   ANDRÉ BIROTTE JR.
    United States Attorney
2   ROBERT E. DUGDALE
    Assistant United States Attorney
3   Chief, Criminal Division
    STEVEN R. WELK
4   Assistant United States Attorney
    Chief, Asset Forfeiture Section
5        U.S. Courthouse, 14th Floor
         312 N. Spring Street
6        Los Angeles, CA 90012
         Telephone: (213)894-6166
7        Facsimile: (213)894-7177

8   JENNIFER SHASKY CALVERY
    Chief
9   FREDERICK REYNOLDS
    Deputy Chief
10  PAMELA J. HICKS
    Senior Trial Attorney
11  Asset Forfeiture and Money Laundering Section
    U.S. Department of Justice, Criminal Division
12       1400 New York Ave., NW,
         Washington, DC 20530
13       Telephone: (202) 514-1263
         Facsimile: (202) 514-5522
14
    Attorneys for Plaintiff
15  United States of America

16

17                      UNITED STATES DISTRICT COURT

18              FOR THE CENTRAL DISTRICT OF CALIFORNIA

19
    UNITED STATES OF AMERICA,      )   NO.   CV 07-3319 SVW (JTLx)
20              Plaintiff,         )
                v.                 )   PLAINTIFF'S OPPOSITION TO
21                                 )   MOTION TO DISMISS FIRST
    3,329 FIREARMS AND ASSORTED    )   AMENDED COMPLAINT;
22  AMMUNITION,                    )   DECLARATION OF AUSA STEVEN
                                   )   R. WELK
23              Defendants.        )
                                   )   DATE: June 13, 2011
24  MICHAEL   ANTHONY   VIRGILIO,) TIME: 1:30 pm
    ELIZABETH   ANN   VIRGILIO;)   CTRM: 6
25  RABENSAR, INC,                 )
                                   )
26              Claimants.         )
                                   )
27  _____)

    / / /
28

1

# TABLE OF CONTENTS

2
PAGE

3 TABLE OF AUTHORITIES. ................................................................................. ii

4 I.   INTRODUCTION. ................................................................................. 3

5 II.  STATEMENT OF FACTS. ..................................................................... 4

6      A.   Individuals and Entities. .............................................................. 4

7      B.   Applicable Statutory Framework. ............................................... 5

8      C.   Illegal Sales of Firearms and Ammunition. ................................ 5

9      D.   Substantial Involvement of Boulevard Firearms in Crimes. ....... 8

10     E.   The Conspiracy to Obstruct ATF. ............................................... 9

11 III. ARGUMENT. ......................................................................................... 10

12     A.   The Pleading Standard. ................................................................ 10

13     B.   Count I Satisfies the Particularity Requirements of 18 U.S.C.
            § 924(d)(2)(C) and States a Valid Claim. ................................... 13
14
            1.   The Violation -- Illegal Sales to Felons -- and the FOPA ....... 13
15
            2.   The Lack of A Circuit Split . ................................................ 14
16
            3.   Inventory Forfeitures Are Proper Under Facts Like Those
17               Alleged Here. ...................................................................... 17

18          4.   The Type of Illegal Sales Alleged Does Not Determine
                 Forfeitability. ...................................................................... 20
19
            5.   The Broad Forfeiture Authority of 924(d) . ........................ 23
20
            6.   Dismissal of the Amended Complaint at the Pleading Stage
21               Would Be Inconsistent with the Applicable Authority. .......... 26

22     C.   Count II Meets the Particularity Requirements of 18 U.S.C.
            § 924(d)(2)(C) and States a Valid Claim. ................................... 27
23
       D.   Count III States a Valid Claim. .................................................. 30
24
25 IV.  CONCLUSION. ..................................................................................... 31

26

27

28                                              i

# TABLE OF AUTHORITIES

**FEDERAL CASES**          **PAGE**

*Bailey v. United States*,
   516 U.S. 137 (1995)........................................................................ 21, 27

*Beisler v. Commissioner of Internal Revenue*,
   814 F.2d 1304 (9th Cir. 1987). ...................................................... 23

*Cahill v. Liberty Mutual Insurance Co.*,
   80 F.3d 336 (9th Cir. 1996). .......................................................... 2

*Conley v. Gibson*,
   355 U.S. 41 (1957)......................................................................... 10

*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.*,
   911 F.2d 242 (9th Cir. 1990). ....................................................... 24

*De La Cruz v. Tormey*,
   582 F.2d 45 (9th Cir. 1978). ......................................................... 10

*Dennis v. United States*,
   384 U.S. 855 (1966)....................................................................... 28

*Duncan v. Walker*,
   533 U.S. 167 (2001)....................................................................... 11

*Haas v. Henkel*,
   216 U.S. 462 (1910)....................................................................... 28

*Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000).......................................................................... 12

*Heay v. Phillips*,
   201 F.2d 220 (9th Cir. 1952). ....................................................... 25

*Huddleston v. United States*,
   415 U.S. 814 (1974)....................................................................... 22

*Kokkonen v. Guardian Life Insurance Co. of America*,
   511 U.S. 375 (1994)....................................................................... 14

*McGlinchy v. Shell Chemical Co.*,
   845 F.2d 802 (9th Cir. 1988). ....................................................... 9

*Popovitch v. Kasperlik*, D.C.,
   76 F.Supp. 233 (D. Pa. 1947). ...................................................... 25

*Rennie & Laughlin, Inc. v. Chrysler Corp.*,
   242 F.2d 208 (9th Cir.1957). ........................................................ 24

*TRW, Inc. v. Andrews*,
   534 U.S. 19 (2001).................................................................... 11

*United States v. 1,922 Assorted Firearms*,
   330 F. Supp. 635 (E.D. Mo. 1971). ....................................... 17

*United States v. 89 Firearms*,
   465 U.S. 354 (1984).................................................................. 21

*United States v. Approximately 627 Firearms, More or Less*,
   589 F. Supp. 2d 1129 (S.D. Iowa 2008). ........................... 20, 21, 25

*United States v. Ardmore Drive*,
   178 F. Supp. 2d 572 (M.D. N.C. 2001). ...................................... 9

*United States v. Bornfield*,
   145 F.3d 1123 (10th Cir. 1998). .................................................. 26

*United States v. Caldwell*,
   989 F.2d 1056 (9th Cir. 1993). .................................................... 28

*United States v. Eighty-Six Firearms and Twenty-Two Rounds of Ammunition*,
   623 F.2d 643 (10th Cir. 1980). ...................................... 14, 15, 17, 21

*United States v. Four Hundred Seventy Seven (477) Firearms*,
   2010 WL 1981023 (E.D. Mich. 2010). ............................ 20, 21, 25

*United States v. Fifty-Two Firearms*,
   362 F. Supp. 2d 1308 (M.D. Fla. 2005)........................... 13, 17, 18

*United States v. Lopez-Burgos*,
   435 F.3d 1 (1st Cir. 2006)............................................................ 10

*United States v. One Assortment of 12 Rifles and 21 Handguns*,
   313 F. Supp. 641 (D.C. Fla. 1970)................................. 17, 20, 21

*United States v. One Assortment of 89 Firearms*,
   511 F. Supp. 133 (D.C. S.C. 1980). ........................................... 20

*United States v. One Assortment of Seven Firearms*,
   632 F.2d 1276 (5th Cir. 1980). ..................................... 13, 14, 17

*United States v. Seher*,
   562 F.3d 1344 (11th Cir. 2009). ............................................ 26, 27

*United States v. Tencer*,
   107 F.3d 1120 (5th Cir. 1997). .................................................... 26

*United States v. Wyly*,
   193 F.3d 289 (5th Cir. 1999). ...................................................... 26

iii

# FEDERAL STATUTES AND RULES

18 U.S.C. § 371 ...................................................................... 28, 29

18 U.S.C. § 921 *et seq* ................................................................ 3

18 U.S.C. § 922 .......................................................................... 21

18 U.S.C. § 922(a)(1) .................................................................. 18

18 U.S.C. § 922(a)(1)(a) ............................................................. 20

18 U.S.C. § 922(b)(2) .................................................................. 25

18 U.S.C. § 922(b)(3) ............................................................... 3, 25

18 U.S.C. § 922(b)(5) .................................................................. 25

18 U.S.C. § 922(d) ................................................................ passim

18 U.S.C. § 922(d)(1) .............................................................. 11, 25

18 U.S.C. § 922(g) ....................................................................... 3

18 U.S.C. § 922(g)(1) ............................................................... 4, 25

18 U.S.C. § 922(t) ....................................................................... 25

18 U.S.C. § 924(d) ................................................................ passim

18 U.S.C. § 924(d)(1) .................................................................. 11

18 U.S.C. § 924(d)(2)(C) ....................................................... 11, 16, 25

18 U.S.C. § 924(d)(3)(C) .......................................................... 19, 22

18 U.S.C. § 924(d)(3)(D) .......................................................... 11, 19

18 U.S.C. § 981(a)(1)(A) ............................................................. 26

18 U.S.C. § 983 ........................................................................... 8

18 U.S.C. § 983(a)(3)(D) ........................................................ 8, 9, 10

18 U.S.C. § 983(c)(2) ............................................................... 9, 10

18 U.S.C. § 881(a)(6) .................................................................. 14

31 U.S.C. § 5317 ........................................................................ 26

Fed.R.Civ.P. 12(b)(6) ................................................................ 6, 9

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Action

    Rule G. ....................................................................................... 8, 9, 10, 24

    Rule G(2). ............................................................................................. 9

    Rule G(2)(b)(ii). ................................................................................... 9

    Rule G(2)(f). ......................................................................................... 9

    Rule E(2). ............................................................................................. 10

## MISCELLANEOUS

132 Cong. Rec. H1649-03 (1986). .......................................................... 13

Pub. L. 90-351, § 1201, 82 Stat. 236 (1968), amended,
Pub. L. 90-618, § 301 (a)(1), 82 Stat. 1236, (1968), 18 U.S.C. App. § 1201 ........ 22

S. Rep. No. 98-583, 98th Cong., 2d Sess. 24-25 (August 8, 1984). ....... 23

S. Rep. No. 1097, 90th Cong., 2d Sess., 108 (1968). ............................. 22

S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968). .............................. 22

# I.  INTRODUCTION

Claimants' motion is properly granted only if, taking all of the allegations of the Amended Complaint as true and drawing all inferences in favor of the government, the Court finds that the government has failed to state a claim for which relief can be granted.  The Amended Complaint describes a lengthy and aggressive pattern of intentional violations of federal firearms laws by people who, in obtaining licenses allowing them to deal in firearms, accepted direct responsibility for ensuring that those laws were followed.  The Amended Complaint contains both numerous specific examples of illegal sales of firearms and ammunition, and substantial circumstantial evidence demonstrating that such sales were not only common, but contributed significantly to the commission of other crimes involving firearms.

Federal law and authority manifests a strong preference for the determination of cases on the merits.  That preference is particularly strong in civil forfeiture cases, as both the governing statute and the procedural rule place explicit restrictions on the dismissal of cases at the pleading stage.  The relief sought by the government in this case is not novel or unique.  There is ample statutory and judicial authority for the proposition that the offering of firearms for sale in an illegal manner triggers forfeiture of the offending seller's inventory. Where such forfeitures have been denied, it has been because of failures of proof, not because of insufficient pleading.  In cases like this one, where an arms dealer has made his inventory available for illegal sales, that inventory has been deemed forfeitable.

Dismissal of this action would frustrate the statutory forfeiture scheme enacted by Congress by placing improper limitations on the assets subject to forfeiture under that scheme.  The broad forfeiture authority expressed in the statutes implicated here, together with the strong preference for merits determinations, compel denial of Claimants' motion.  Finally, dismissal of the

Amended Complaint would not accomplish any of the goals of the Firearm

Owners Protection Act, which was enacted to protect the constitutional rights of

law-abiding citizens, not the firearm inventories of corrupt federal firearms

licensees and their legally prohibited clientele.

## II. STATEMENT OF FACTS[1]

### A. Individuals and Entities

At the time of the seizure of the defendants, claimant Rabensar, Inc. was a

federally licensed firearms dealer operating out of two business locations in this

district: 1316 North Long Beach Boulevard, Compton, California; and 101 West

Short Street, Oak View, California.[2]  Rabensar conducted its firearms business

under the name "Boulevard Sales & Service."  *See* First Amended Complaint

("FAC") at ¶8.  Claimant Elizabeth Ann Virgilio was the president and co-owner

of Rabensar (*id.* at 9), and Michael Virgilio (deceased) was the vice president and

co-owner.  *Id*. at ¶10.  Michael Virgilio also held a FFL, by which he conducted

business out of the Compton location under the name "Boulevard Auto Sales."  *Id*.

at ¶11.  Stephen Virgilio was an employee of Rabensar, as well as the son of

Michael Virgilio and stepson of Elizabeth Ann Virgilio.  *Id*. at ¶12.  Carlos

Castellanos was an employee of Rabensar.  *Id*. at ¶13.  The claimants and their

businesses are collectively referred to herein as "Boulevard."

---

[1]    The facts are taken from the allegations of the Amended Complaint.  In
ruling on a motion to dismiss a complaint for failure to state a claim, the court
should accept as true all material allegations in the complaint (as well as all
reasonable inferences to be drawn therefrom) and construe them in the light most
favorable to the plaintiff.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th
Cir. 1996)*;*

[2]    Rabensar had two federal firearms licenses ("FFLs"), which it has since
surrendered.  Michael Virgilio had a separate FFL, which he surrendered before he
died.

## B.  Applicable Statutory Framework

The federal Gun Control Act, 18 U.S.C. §921 *et seq.* ("GCA"), makes it
unlawful for certain persons, including felons, unlawful drug users and illegal
aliens, to possess firearms.  18 U.S.C. § 922(g).  It also makes it unlawful for any
person to sell or dispose of a firearm to someone he knows or has reason to believe
is a felon or other prohibited person.  18 U.S.C. § 922(d).  *Id*. at ¶15.  With certain
limited exceptions, the GCA also makes it unlawful for federally licensed firearms
dealers to sell or deliver any firearm to any person the licensee has reasonable
cause to believe does not reside in the state in which the licensee's place of
business is located.  18 U.S.C. § 922(b)(3).  *Id*. at ¶16.  The Attorney General has
delegated the authority to enforce the GCA to the Bureau of Alcohol, Tobacco,
Firearms and Explosives ("ATF").  *Id.* at ¶14.  The defendant items meet the
definition of firearms and ammunition, as appropriate, as set out in the GCA.  *Id*.
at ¶6.

## C.  Illegal Sales of Firearms and Ammunition

The FAC describes numerous specific illegal sales of firearms and
ammunition by Boulevard, as well as a much larger pattern of such activity.  In
each of the specific examples cited, the illegal sales were made from Boulevard's
on-site inventory of firearms and ammunition.  Neither Claimants nor their
employees placed any restrictions on what the prohibited buyers were allowed to
purchase, and none of the examples involved special orders or requests for
firearms not in Boulevard's inventory.  The illegal firearm sales, or "straw
purchases," were made with the knowledge and consent of Elizabeth Ann and
Michael Virgilio, and carried out in such a way that a person prohibited from
buying firearms could do so merely by bringing a non-prohibited person to fill out
the paperwork for the purchase.  *Id*. at ¶28.

The following specific example is typical of the transactions described in
the FAC.  An individual identified as "Felon 1" met Castellanos in 2003, and told

3

Castellanos that he was just out of prison and wanted to purchase a firearm. *Id*. at ¶ 26. At Castellanos's invitation, Felon 1 came to Boulevard's Compton store with a non-felon acquaintance and had the acquaintance complete the paperwork for the firearm purchase. Castellanos showed the acquaintance how to fill out the paperwork. *Id.* Felon 1 made subsequent purchases of firearms from Boulevard using this same technique, and Stephen Virgilio was present during all of those transactions. *Id.* This was a knowing violation of the GCA.

As part of the initiation of the ATF investigation into Boulevard, an ATF confidential informant ("CI-1") who was a convicted felon (*i.e.*, a person prohibited from possessing firearms under 18 U.S.C. § 922(g)(1)), went into the Compton store and spoke to Stephen Virgilio about purchasing a firearm. FAC at ¶29. When CI-1 admitted that he was a convicted felon, Stephen Virgilio told him that he (CI-1) would fail the background check and lose his deposit. CI-1 then asked if he could bring in his girlfriend to purchase the firearm, and Stephen Virgilio told him he could. *Id.* When CI-1 returned to the store to have his girlfriend buy the gun (LAPD Officer Ruiz, acting in an undercover capacity), Stephen Virgilio was not there, so CI-1 spoke to Castellanos. CI-1 told Castellanos that he had felony convictions and asked whether his girlfriend could buy the firearm for him. Castellanos -- like Stephen Virgilio before him -- said that CI-1's girlfriend could buy the gun for him. *Id.* at ¶32. Castellanos then proceeded to coach Officer Ruiz through the straw purchase, assisting her in answering the questions on the Form 4473, including falsely indicating that she was the actual purchaser. *Id.* at ¶¶35-36. This was also a knowing violation of the GCA.

Time and again over the course of the investigation, ATF sent confidential informants who were clearly prohibited persons into Claimants' two gun stores to make illegal purchases of firearms and ammunition. On each occasion, the prohibited persons were permitted to purchase firearms (via straw purchase) and

ammunition (directly), regardless of which employee they dealt with, and without any restrictions.  They bought rifles, shotguns, handguns, and various calibers of ammunition, all from Boulevard's available inventory.  Indeed, far from restricting any of the buyers, Claimants and their employees encouraged them to buy as much as they wanted.  In one instance, Michael Virgilio indicated he would give CI-1 a discount if he purchased 10,000 rounds of ammunition.  *Id.* at ¶152.  When CI-1 decided to buy only 3,000 rounds, Virgilio complained that he thought CI-1 was going to buy 10,000 rounds and then encouraged CI-1 to wait and get all 10,000 rounds at the same time instead of taking only 3,000.  *Id.* at ¶ 166.  When CI-1 insisted on buying only 3,000 rounds, Virgilio clarified that he would get 7,000 rounds next time and not continue to spread out the purchase.  *Id.* at ¶167.

       At no time during any of the sales to the ATF confidential informants did Claimants or their employees display any reluctance to engage in straw or otherwise illegal sales, of firearms or ammunition.  They gave no indication that they were not completely conversant in and comfortable with straw firearms sales or sales of firearms or ammunition to convicted felons.  In fact, they repeatedly coached confidential informants how to complete the illegal sales.  Among other things they (1) helped straw purchasers answer the questions on the Form 4473 (*id.* at ¶¶35-36, 46, 66, 72, 75, 77, 82, 142); (2) demonstrated how various firearms worked to the prohibited buyers (*id.* at ¶¶63, 100); (3) willfully falsified records relating to the California Handgun Safety Certificate (*id.* at ¶49) and the California Dealer Record of Sale system (*id.* at ¶136); (4) assured the prohibited buyers that they could buy ammunition directly from Boulevard without leaving any records (*id.* at ¶¶85-87); and (5) advised straw purchasers how to avoid getting into trouble (*id.* at ¶¶48, 124, 138).  Far from describing a few illegal sales, the allegations of the FAC paint a portrait of gun dealers who were ready and willing to arm anyone who came in the door and could afford to pay Boulevard's inflated prices, making repeated illegal sales of firearms and ammunition to felons and

others who were barred by federal law from buying or possessing firearms. Indeed, the illegal sales of firearms by claimants were so robust that ATF detected other straw sales being conducted during its undercover operation. *Id.* at ¶¶176-180, 210-212).

### D.   Substantial Involvement of Boulevard Firearms in Crimes

Not surprisingly, given their sales practices, a significant number of guns sold by Boulevard were subsequently involved in crimes, including a high number of short "time-to-crime" guns.[3]  Between January 1, 2002 and March 22, 2007 (the date of the execution of search warrants at Boulevard's locations), approximately 1,627 crime guns recovered by law enforcement were traced back to Boulevard's Compton store.  FAC at ¶218.  Although Boulevard has been out of business since the 2007 seizure, firearms sold there continue to turn up in crimes, including the 2009 murder of a U.S. Border Patrol agent.  *Id.* at 219.

In 2005 and 2006, the two years prior to the execution of the seizure warrants, 697 crime guns were traced to Boulevard.  More than 300 of those firearms were recovered in association with weapons possession violations.  *Id.* at ¶220.  Of the remainder, 40 were traced to assaults; seven to car-jackings; 60 to drug-related offenses; 24 to robberies, burglaries, and extortion crimes; 10 to carrying a concealed weapon; 23 to homicides and three to attempted homicides; four to arson and explosives offenses; and 23 to non-possession weapons offenses. *Id.* at ¶221.  Boulevard also had a substantial and unusually high number of short time-to-crime traces, which is an indicator of illegal sales.  Specifically, between

---

[3]  Claimants dispute the relevance of the crime gun trace data in the FAC, but a motion to dismiss is a not a forum for weighing evidence.  It is certainly reasonable to infer that a firearms store engaged in routine sales of firearms to convicted felons would have a high number of crime gun traces.  That inference is bolstered by the crime gun trace data.  To the extent claimants take issue with the significance of the data or how the data is characterized, that argument goes to the weight of the evidence, and is not a proper basis for a Rule 12(b)(6) dismissal.

January 1, 2002, and March 22, 2007, more than 600 of the 1,627 crime guns traced to Boulevard had a time-to-crime period of three years or less. Of these, more than half (323) were recovered within one year of purchase. *Id.* at ¶223. The FAC also alleges pricing information indicating that Boulevard charged significantly more for firearms than other dealers. *Id.* at ¶¶225-27. The government alleges that the Virgilios charged such a premium because they readily provided a service that other dealers did not -- the ability to purchase firearms while being legally barred from doing so.[4]

### E. The Conspiracy to Obstruct ATF

The FAC also alleges a conspiracy to obstruct ATF from enforcing the GCA. Boulevard and its owners and employees, including Elizabeth Ann Virgilio, Stephen Virgilio, Michael Virgilio and Carlos Castellanos, knowingly and willfully combined, conspired, confederated, and agreed with each other and others to defraud ATF, an agency of the United States, by impeding, impairing, obstructing and defeating ATF's lawful functions and its enforcement of federal firearms laws and regulations. FAC at ¶229. The purpose and object of the conspiracy was to violate federal firearms laws and regulations to sell firearms and ammunition for profit while simultaneously preventing ATF from discovering the illegal disposition of firearms and ammunition sold by Boulevard, and uncovering the business operations of Michael and Elizabeth Ann Virgilio. *Id.* at ¶230.

---

[4] Claimants' only response to this allegation is that the FAC "speculates that Claimants' 'gross margin profits' implied unlawful acts. This leap in logic knows no bounds." Memorandum at 20, fn 26 (internal citation omitted). In fact, the inference that prohibited persons would be willing to pay more for new firearms is a reasonable one. A non-prohibited person has the luxury of comparison shopping among any number of legitimate licensed dealers. A prohibited person is required to find a dealer willing to engage in illegal sales. As with the trace data, to the extent claimants dispute the inference, that argument is unavailing in the context of this motion.

The overt acts committed in furtherance of the conspiracy included: (1) repeated misrepresentations to ATF of Claimants' willingness to comply with federal firearms laws; (2) knowing and intentional creation and maintenance of inaccurate and incomplete records; (3) falsification of records to make it more difficult to determine the true facts surrounding the illegal sales of firearms; (4) routine sales of firearms and ammunition to prohibited persons; (5) advising straw purchasers what to do in the event the true (unlawful) purchaser committed a crime using the firearm; and (6) concealment of the true nature of their firearms business, including the fact that it was operating as an unlicensed partnership.  *Id.* at ¶¶233-35.

## III.  ARGUMENT

### A.  The Pleading Standard

The procedural aspects of civil forfeiture actions are governed by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the procedural provisions of which are codified principally at 18 U.S.C. § 983[5] and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules").  Supplemental Rule G, adopted specifically to govern civil forfeiture actions *in rem*, provides, in pertinent part:

> (b) Motion to Dismiss the Action.
>
> (I) A claimant who establishes standing to contest forfeiture may move to dismiss the action under Rule 12(b).
>
> (ii) In an action governed by 18 U.S.C. § 983(a)(3)(D), the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.  The sufficiency of the complaint is governed by Rule G(2).

---

[5]  Of particular significance here is 18 U.S.C. § 983(a)(3)(D), which provides that "No complaint shall be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."

1    While CAFRA raised the government's ultimate burden of proof in civil

2  forfeiture cases (from probable cause to preponderance of the evidence), it relaxed

3  the pleading requirement.  Under the general federal standard, a civil litigant

4  seeking dismissal of a complaint must establish that "no relief could be granted

5  under any set of facts that could be proven consistent with the allegations."

6  *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988).  The civil

7  forfeiture standard under Rule G is less demanding.  Applying the Rule 12(b)(6)

8  standard in light of the provisions of 18 U.S.C. § 983(a)(3)(D), (c)(2)[6], and

9  Supplemental Rule G(2)(b)(ii) (quoted below) "can only lead one to the

10  conclusion that CAFRA expresses Congress's intention to relax the 12(b)(6)

11  standard of review . . . in civil forfeiture proceedings."  *United States v. Ardmore*

12  *Drive*, 178 F. Supp. 2d 572, 581 (M.D. N.C. 2001).

13    The standard for determining the sufficiency of a civil forfeiture complaint

14  is set out in Supplemental Rule G (2), which provides that the complaint must:

15    (a) be verified;

16    (b) state the grounds for subject-matter jurisdiction;

17    (c) describe the property with reasonable particularity;

18    (d) if the property is tangible, state its location when any seizure
    occurred and – if different – its location when the action is filed;

19

20    (e) identify the statute under which the forfeiture action is brought;
    and

21    (f) state sufficiently detailed facts to support a reasonable belief that
    the government will be able to meet its burden of proof at trial.

22

23  The wording of subsection (2)(f) is critical because it is an explicit statement of

24  the government's pleading burden that does not incorporate or otherwise implicate

25  any other standard.  Cases interpreting the provisions of the previously-applicable

26    [6] "In a suit or action brought under any civil forfeiture statute for the civil

27  forfeiture of any property - the Government may use evidence gathered after the
    filing of the complaint for forfeiture to establish . . . that the property is subject to

28  forfeiture."

(and far more ambiguous) Supplemental Rule E(2) are of limited, if any, utility; first because Congress, in enacting CAFRA, "made clear that the pleading requirements imposed by [pre-CAFRA cases] no longer apply" (*United States v. Lopez-Burgos*, 435 F.3d 1, 3 (1st Cir. 2006)), and second because cases interpreting Rule E(2) necessarily pre-date the new standard expressed and adopted in Rule G.

While it is beyond dispute that Congress, in enacting CAFRA, sought to level the playing field in civil forfeiture cases by making those cases more like other civil cases in federal court, it is equally clear that in enacting § 983(a)(3)(D) and § 983 (c)(2), Congress sought to ensure that the government would have the opportunity to develop its case, and would not face the prospect of dismissal at the pleading stage on the ground that the operative complaint contained insufficient evidence to establish its ultimate burden of proof.  The adoption of the relaxed pleading standard in Rule G further clarified that intent.

Even outside the forfeiture context, motions to dismiss claims for legal insufficiency are viewed with disfavor.  *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).  "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (footnote omitted).  Thus, the "issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims."  *De La Cruz*, 582 F.2d at 48.

///

///

**B.    Count I Satisfies the Particularity Requirements of 18 U.S.C. § 924(d)(2)(C) and States a Valid Claim**

1.    <u>The Violation -- Illegal Sales to Felons -- and the FOPA</u>

Count I of the FAC seeks forfeiture of the defendants pursuant to 18 U.S.C. §§ 924(d)(1) and 924(d)(3)(D) on the ground that they were intended to be used in one or more offenses described in 18 U.S.C. § 922(d)(1)(disposing of firearm or ammunition to a felon).  Claimants move to dismiss Count I on the grounds that it fails to comply with 18 U.S.C. § 924(d)(2)(C), which states that:

> Only those firearms or quantities of ammunition particularly named and individually identified as involved in or used in any violation of the provisions of this chapter or any rule or regulation issued thereunder, or any other criminal law of the United States or as intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure, forfeiture, and disposition.

In making this argument, Claimants rely primarily on this Court's December 8, 2010 Order Granting Claimants' Motion for Judgment on the Pleadings with Leave to Amend and Denying Motion to Strike (hereinafter "the December 2010 Order").  As a preliminary manner, the firearms sought for forfeiture *are* particularly named in the FAC, and the allegations of the FAC clearly allege that the firearms and ammunition were involved or used in the illegal acts described. Claimants cannot prevail here on the ground that the government has failed to allege the requisite factual elements of the claim.  Rather, their argument depends upon a narrow interpretation of the legislative history of the Firearm Owners Protection Act ("FOPA") that, for the reasons explained below, has the effect of rendering portions of the underlying statute superfluous or meaningless.[7]

---

[7]    It is a "'cardinal principle of statutory construction' that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant."  *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Specifically, Claimants' arguments rest on the propositions that (1) prior to FOPA, there was a "split" in authority regarding whether firearm inventories could be forfeited, and (2) FOPA resolved that "split" in a way that prevents the Government from forfeiting firearms not directly involved in the alleged violation. Here, that would limit the forfeiture to those firearms and ammunition actually sold illegally. But as explained below, that interpretation would result in no forfeiture authority at all, since the government need not forfeit something it already owns. In fact, there is no indication in either the statutory language or the applicable legislative history that compels the conclusion that the language added to the forfeiture provision of § 924(d) by FOPA was intended to resolve a "split" in authority concerning the forfeitability of firearms beyond those illegally sold.[8] The government respectfully suggests that a careful reading of the cases applying the relevant forfeiture provisions demonstrates that there was no conflict that required resolution, and that the narrow reading of the statute and the legislative history urged by Claimants serves neither the language nor purpose of the FOPA.

## 2.    The Lack of A Circuit Split

The FOPA was not a general purpose Act.

[A]s might be inferred from its name, the Firearm Owners' Protection Act principally protected the rights of gun owners. . . . . Specifically, Congress found the legislation necessary to protect the citizens' rights to bear arms, and to reaffirm the intent of Congress as expressed in the [GCA] - namely, to refrain from placing undue burdens on law-abiding citizens with respect to the possession or use of firearms.

---

[8] The best evidence of what Congress intended is the statutory language itself. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000)("we begin with the understanding that Congress says in a statute what it means and means in a statute what it says there.")(internal quotation marks omitted). As discussed below, the only language change made by FOPA with regard to forfeiting firearms intended to be used in a violation of § 922(d) was to alter the Government's ultimate burden of proof at trial.

*United States v. Fifty-Two Firearms*, 362 F.Supp2d 1308, 1319 (M.D. Fla. 2005),
citing 132 Cong. Rec. H1649-03 (1986). What cannot reasonably be disputed here
is that the unambiguous allegations of the FAC have nothing to do with the
constitutional right of law-abiding citizens to bear arms. This case is about one
group of people illegally selling firearms and ammunition to members of a specific
class of people who were clearly and unequivocally barred by federal law from
acquiring them. FOPA was not enacted to protect the illegal conduct of rogue
FFLs or to ensure that convicted felons had a place to go when they wanted to buy
guns or ammunition. The forfeiture of the inventories of illegal gun sellers,
including that of Claimants, promotes the purposes of FOPA and the GCA.

Claimants rely heavily on *United States v. One Assortment of Seven
Firearms*, 632 F.2d 1276 (5th Cir. 1980) in support of their circuit split argument.
*Seven Firearms*, it should be noted at the outset, was *not* a case in which the
government sought to forfeit an entire inventory of a dealer engaged in unlawful
sales. Rather, the government sought only seven firearms the dealer had illegally
sold (but not yet delivered) to undercover agents. In holding that forfeiture of
those firearms was proper, the court stated,

> Quite clearly under our construction of the statute, forfeiture of
> firearms may be ordered in cases, as this one, in which the
> government shows and the district court finds an intent to violate
> § 922. But the statutory provision does contain limiting language.
> The firearms, to be subject to forfeiture, must be reasonably identified
> to the violation, or in this case, to the sale. By holding that
> identification is a necessary indicator of intent, we give meaning to
> the words "intended to be used . . . in any violation," while ensuring
> that portions of a firearms dealers inventory that are unrelated to a
> given violation are not swept away by enforcement officers.

*Seven Firearms*, 632 F.2d at 1279. The court had no need to (and did not) address
what standards should be applied to determine which firearms in the seller's
inventory were "intended to been used" in a particular offense because that issue
was not before it on the government's limited claim. It stated nothing more than
the non-controversial proposition that portions of an inventory *not* related to a

13

given violation were not to be "swept away by law enforcement officers."  This is the functional equivalent of a holding in a Title 21 drug forfeiture case that if a drug dealer deposits drug proceeds into a bank account, the non-tainted balance of the account is not subject to forfeiture as proceeds of drug trafficking.[9]

Claimants (and the Court, in its December 2010 Order) interpret *Seven Firearms* to mean that the government is limited in every case to forfeiting only the firearms actually involved in an illegal sale, and that interpretation is essential to the subsequent argument (and conclusion) that *Seven Firearms* created a split in authority with those circuits that had upheld the government's ability to forfeit entire inventories, particularly *United States v. Eighty-Six Firearms and Twenty-Two Rounds of Ammunition*, 623 F.2d 643 (10th Cir. 1980).  But this analysis fails to account for the fact that *Seven Firearms* was *not an inventory case*, meaning that any commentary by that court concerning inventory forfeitures was, at best, dictum, which is not a proper basis for establishing a rule of law or a circuit split. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 379 (1994) ("It is to the holdings of . . . cases, rather than their dicta, that we must attend.") .  Nor is the characterization of a split in authority supported by the actual text of *Seven Firearms*, in which the court identifies *Eighty-Six Firearms* as one of the cases that had considered when a potential violation "must have ripened to suffice under the 'intended to be used in' language of § 924(d)." *Seven Firearms*, 632 F.2d at 1278-79.  Nowhere in its discussion of the earlier opinion does it criticize or indicate that it was in disagreement with the holding in *Eighty-Six Firearms*, or suggest that it was creating a circuit split.

/ / /

---

[9]    However, if the government can establish that the other funds in the account were intended to be exchanged for a controlled substance, those funds would be subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

3.    <u>Inventory Forfeitures Are Proper Under Facts Like Those</u>
<u>Alleged Here</u>

The government does not (and need not) argue that inventory forfeitures are appropriate in every civil forfeiture case involving the illegal sale of firearms.  It need only show that in *this* case such a forfeiture is reasonably possible based on the allegations of the FAC and the applicable law.  The overwhelming authority stands for the proposition that inventories are properly forfeited where an inventory is offered for sale illegally, regardless of the specific basis for the illegality.

In *Eighty-Six Firearms*, the government sought to forfeit the inventory of a dealer who had unlawfully sold handguns to undercover agents.  The district court permitted the forfeiture of all of the handguns, but denied forfeiture of the long guns.  623 F.2d at 645.  The Court of Appeals held that all of the firearms should have been forfeited, reasoning that although the agents purchased only handguns, there was "little reason to doubt that the long guns would willingly have been sold to the agents if they had asked." *Id.*  In reaching that conclusion, the court noted that (1) the guns were on display for the purchasing agent's inspection and (2) although the dealer recommended a handgun, he directed the agent's attention to the long guns. *Id.*  Implied in the Court's holding is that had the dealer not offered the long guns for sale, they would not have been forfeitable.  They would have been, to use the Fifth Circuit's phrasing, "unrelated to [the] given violation."

A recent case in this district presented virtually identical facts as this case, was challenged on the same grounds as the FAC here, and was found to be sufficient to withstand a motion for judgment on the pleadings.  In *United States v. 206 Firearms and 41,725 Rounds of Ammunition*, case no. CV 09-09235 MMM, the government alleged that a licensed firearms dealer had sold several firearms to a convicted felon as part of an ATF undercover investigation, and sought forfeiture of the dealer's inventory as a result.  The claimant moved for judgment

15

on the pleadings, arguing (like the Claimants here) that the complaint failed to

satisfy the particularity requirements of § 924(d)(2)(C) and failed to state a claim

on which relief could be granted.  *See* exhibit A to the Welk Decl. at 6.  The court

denied claimant's motion, finding:

> The government complied with § 924 for pleading purposes by listing every firearm and round of ammunition that it seized on the ground that it was intended to be used in violating provisions of the GCA.  It also provided sufficient facts to detail "the alleged scheme" and why the government contends that Mitchell "intended" to use the entire inventory at Lock, Stock & Barrel in carrying the scheme out.  Stated differently, the government pleaded "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its [clear and convincing] burden of proof at trial."

*Id.* at 7 (citations and footnotes omitted).  With respect to what allegations were

sufficient to meet the government's pleading burden, the court stated:

> The complaint alleges that in completing straw purchaser transaction for the benefit of a CI, Mitchell "knew [that] the convicted felon had obtained additional firearms from Lock, Stock & Barrel, and . . . indicated a future willingness to sell the CI more firearms."  It asserts that on September 10, 2008, Mitchell helped CI-1, a person whom he allegedly knew or had reason to believe was a convicted felon, purchase a firearm but "completed the store invoice using CI-2's name and information."  The complaint alleged that "Mitchell specifically noted that CI-1 had purchased similar firearms," and expressed a willingness to help CI-1 with the purchase that day because CI-1 would be coming back.

*Id.* at 7-8.  The same type of allegations are made in the FAC, but in greater detail

and on more numerous occasions.

In rejecting claimant's contentions regarding the effect of FOPA on the

forfeitability of the firearms, the court stated "[c]laimant confuses the legal

standard that governs the government's pleading of a forfeiture claim with its

burden of proof at trial.  In deciding the present motion, the court addresses only

whether the complaint supports a reasonable belief that the government can meet

its burden of proof for intent."  *Id.* at 7, fn 16.

The December 2010 Order in this case is the only judicial decision which

government counsel has been able to find  -- pre- or post-FOPA -- that essentially

holds that as a matter of law that the government is restricted in a forfeiture case

involving the illegal sale of firearms to the actual firearms sold, and denies the

government the opportunity to even attempt to prove up its allegations.  Where the

government has been denied the forfeiture of an inventory, it has been because of

failures of proof -- not deficiencies in pleading -- that are easily distinguished from

the facts here.  In *United States v. 1,922 Assorted Firearms*, 330 F. Supp. 635

(E.D. Mo. 1971), for example, the court determined that the government had failed

to meet its burden of showing the dealer had the requisite intent to violate federal

firearms laws.  *Id.* at 642.  The illegal sales at issue there were made by a clerk

without the knowledge of the owner, which is not the case here. Nevertheless, the

*1,922 Assorted Firearms* court specifically stated that with different facts, "a

dealer's entire stock of goods may be subject to forfeiture" (*id.* at 641), citing as

an example *United States v. One Assortment of 12 Rifles and 21 Handguns*, 313

F.Supp. 641 (D.C. Fla. 1970), where, as here, the defendant displayed all of his

guns for sale to prospective buyers.  *Id.* at 642.  In other words, far from bolstering

Claimants' reading of § 924(d), *1,922 Assorted Firearms* undermines it, since the

opinion specifically advances the theory offered by the government in this case --

that a firearms inventory offered for sale illegally is subject to forfeiture.[10]  *Eighty-*

*Six Firearms* noted that reliance on *1,922 Assorted Firearms* to avoid forfeiture of

a firearms inventory was "futile."  623 F.2d at 644.

In *United States v. Fifty-Two Firearms*, 362 F. Supp.2d 1308 (M.D. Fla.

2005), the government was denied forfeiture because it failed to commence the

---

[10]  It is also worth noting that the key cases deciding the issue whether forfeiture of an entire inventory of firearms was proper were not determined at the pleading stage, but after trial, meaning that the parties were given the opportunity to develop a full factual record. *See, e.g., Eighty-Six Firearms* (appeal of judgment after trial); *1,992 Firearms* (government motion to amend complaint *during* trial).  It is not clear from the opinion in *Seven Firearms* what happened in the district court, but it appears the case went to trial based on the references to cross-examination and the district court's issuance of findings of fact and conclusions of law.

forfeiture action in a timely manner.  Nevertheless, the court took the opportunity to analyze the sufficiency of the government's allegations concerning the claimant's inventory, which was sought on the grounds that it had been offered for sale (1) to a felon and (2) by an unlicensed seller.  Applying the GCA as amended by FOPA, the court found that the government's allegations involving the sale of a single shotgun to a felon were insufficient to establish probable cause for forfeiture of the claimant's inventory because that single allegation did not establish that the claimant intended to sell all of his inventory *to the felon*.  *Id.* at 1313-14.  However, the court held that the allegations that the claimant had repeatedly sold firearms without a license were sufficient to establish probable cause to believe that the entire inventory was subject to forfeiture as having been involved, used, or intended to be used in a violation of 18 U.S.C. § 922(a)(1) (dealing in firearms without a license).  Nowhere in the opinion does the court indicate that these holdings were related in any way to the changes made by FOPA.  Instead, the analysis focuses entirely on the facts alleged.  Here, the government's allegations establish not only that Boulevard made numerous sales to convicted felons of firearms and ammunition in its inventory, but that such sales were a common practice.

### 4.    The Type of Illegal Sales Alleged Does Not Determine Forfeitability

Courts considering the forfeiture of firearms inventories have looked for guidance to cases involving both the illegal sale of firearms to prohibited persons and cases involving unlicensed dealers without suggesting that the type of illegal sales had a substantive effect on the forfeitability analysis.  In the December 2010 Order, this Court sought to draw a distinction between inventory forfeitures based on illegal sales to felons and those based on sales without a license.  The government contends that there is no meaningful distinction between the two.  Both involve firearm inventories offered for sale illegally.  In both instances, the

inventories are "intended to be used in the offense" if they are offered for sale in violation of law.

To the extent that the distinction is based upon the "pattern" language contained in 18 U.S.C. § 924(d)(3)(C), that does not change the result. Section 924(d)(1) states, in relevant part,

> any firearm or ammunition intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure and forfeiture[.]

The referenced "paragraph (3)" includes 18 U.S.C. § 924(d)(3)(C), which provides:

> (C) any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title where the firearm or ammunition intended to be used in any such offense is involved in a pattern of activities which includes a violation of any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title[.]

In its December 2010 Order, this Court appears to have found that the language regarding "involved in a pattern of activities" differentiates it from the forfeiture authority relating to firearms and ammunition intended to be used in violation of 18 U.S.C. § 922(d), which does not include the "pattern" language, but instead simply states that a firearm is subject to forfeiture as having been intended to be used in "any offense described in section 922(d) of this title where the firearm or ammunition is "intended to be used" in such offense. 18 U.S.C. § 924(d)(3)(D). The "pattern" language in § 924(d)(3)(C) is not a limitation on the statutory forfeiture authority, and the difference it creates is not significant in this setting because the pattern language adds an additional element for forfeitures based on unlicensed dealing that does not apply to forfeitures under § 924(d)(3)(D), which requires only that the government prove firearms and ammunition were involved in a single violation of § 922(d). Since the prohibited purchasers in this case were not limited in any way as to what they could purchase, every firearm in

Boulevard's inventory was "intended to be involved" in each illegal transaction alleged.

For the purposes of the instant motion, at least, the role of the firearms and ammunition here is no different than the firearms forfeited in cases where the dealer was unlicensed. The only difference -- the precise nature of the illegal sales -- is immaterial. In *United States v. One Assortment of 12 Rifles and 21 Handguns*, 313 F.Supp. 641 (D.C. Fla. 1970), the court ordered the forfeiture not only of the firearms sold illegally without a license, but all firearms displayed for sale, reasoning that the unlicensed dealer would have sold all of the firearms if he had had the chance. *Id.* at 642. As a result, all of the firearms were "involved in or intended to be used in" violation of 922(a)(1)(A). *See also United States v. One Assortment of 89 Firearms*, 511 F. Supp. 133 (D.C. S.C. 1980). The same inference should be drawn here, and for the same reasons.

In *United States v. Approximately 627 Firearms, More or Less*, 589 F.Supp.2d 1129 (S.D.Iowa 2008), the government purchased a number of firearms from an unlicensed dealer as part of an undercover investigation. Based on those purchases, the Court held that all of the firearms that were part of the unlicensed dealer's inventory -- more than 600 -- were forfeitable to the Government. The only firearms exempt from forfeiture were "maybe 20 to 25" guns that were in the dealer's personal collection, and the reason for the exemption was that the government had failed to prove during the course of a stipulated evidentiary hearing that those firearms were involved in the offense. *Id.* at 1135.

Similarly, in *United States v. Four Hundred Seventy Seven (477) Firearms*, 2010 WL 1981023 (E.D.Mich. 2010), the Court denied the Government's motion for summary judgment seeking the forfeiture of all of the firearms seized because there were factual disputes about whether some of the seized firearms -- those that had been stored in a basement vault -- had been offered for sale illegally and were

therefore "involved in" the unlawful dealing.  *Id.* at *12.  In reaching this

conclusion the Court stated that:

> In the context of offenses premised on unlawful firearm sales, courts
> have addressed the forfeiture of other firearms "involved in" the
> offense.  Courts have often looked to whether the guns were
> displayed in the same area as the guns that were unlawfully sold and
> whether the guns had price tags.

*Id.* at *8.  Notably, the court relied upon cases involving illegal sales to prohibited

persons (*Eighty-Six Firearms*) and unlicensed sales (*12 Rifles*).  While the court

noted that "courts have not merely presumed that all firearms possessed by a

defendant convicted of unlawful firearms dealing are automatically subject to

forfeiture," it also cited *627 Firearms* as an example of a situation where forfeiture

of an inventory was nevertheless appropriate, even though the claimant's personal

guns were excluded.  *Id.*

### 5.    The Broad Forfeiture Authority of 924(d)

The Supreme Court has discussed the breadth of the forfeiture provisions of

the GCA, noting that in § 924(d) "Congress recognized a distinction between

firearms 'used' in commission of a crime and those 'intended to be used' and

provided for the forfeiture of a weapon even before it had been used."  *Bailey v.*

*United States*, 516 U.S. 137, 146 (1995).  Section 924(d) is designed as a

"remedial civil sanction."  *United States v. 89 Firearms*, 465 U.S. 354, 363 (1984).

In this regard,

> § 924(d) is somewhat broader in scope than the criminal provisions of
> 18 U.S.C. § 922.  Section 924(d) subjects to forfeiture '[a]ny firearms
> or ammunition involved in or used in *or intended to be used* in, any
> violation of the provisions of [the GCA].

*Id.* at 363 (quoting 18 U.S.C. § 924(d), emphasis original to Court's opinion).  The

Court also noted that the breadth of § 924(d) furthered the already broad remedial

aims that Congress intended when it enacted the GCA by, among other things,

"removing from circulation firearms that have been used or intended for use

outside regulated channels of commerce.  Keeping potentially dangerous weapons

21

out of the hands of unlicensed dealers is a goal plainly more remedial that punitive." *Id.* at 1106.

The need to keep firearms and ammunition out of the hands of felons and other prohibited persons is just as great as -- if not greater than -- the need to keep firearms out of the hands of unlicensed dealers.[11]   It makes little sense that the forfeiture authority for a violation of § 922(d) would be narrower than that for a violation of the GCA listed in § 924(d)(3)(C), given that the primary purpose of the GCA was to keep firearms out of the hands of felons and other prohibited persons.  Congress enacted the GCA to address concerns regarding

> the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest.  Pub. L. 90-351, § 1201, 82 Stat. 236, as amended by Pub. L. 90-618, § 301 (a)(1), 82 Stat. 1236, 18 U. S. C. App. § 1201. Congress determined that the ease with which firearms could be obtained contributed significantly to the prevalence of lawlessness and violent crime in the United States.  S. Rep. No. 1097, 90th Cong., 2d Sess., 108 (1968).  The principal purpose of the federal gun control legislation, therefore, was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968).

*Huddleston v. United States*, 415 U.S. 814, 824 (1974).  Yet, under the interpretation of § 924(d) urged by Claimants, the forfeiture provisions applicable to knowingly providing firearms and ammunition to a prohibited person would be narrower than for violations of other GCA provisions.

Contrary to Claimants' assertions that FOPA requires such a narrow reading of § 924(d), that reading is inconsistent with both the statutory history of FOPA and its intended purpose.  Prior to FOPA, the government could forfeit any firearm or ammunition "intended to be used" in a violation of *any* provision of the GCA,

---

[11]   In reality, the two needs are related since one of the primary reasons for channeling commerce in firearms through licensed dealers is to inhibit the ability of felons and other prohibited persons from obtaining firearms.  Claimants, as licensed dealers, actually used their status to pervert the very regulatory scheme they agreed to carry out.

its regulations (including record-keeping violations) or other criminal statute. FOPA restricted forfeiture to situations where the firearm and/or ammunition was intended to be used in connection with a smaller group of crimes, and raised the ultimate standard of proof to clear and convincing evidence.  For the crimes that remained, which include § 922(d), the language establishing forfeitability remained unchanged.

This choice was deliberate.  A prior draft of the bill had amended the GCA to remove forfeiture authority for firearms intended to be used in any crime.  In a recognition of the legitimate law enforcement interest in seizing firearms intended to be used in serious crimes, the language was amended to permit the Government to continue to forfeit firearms intended to be used in "clearly criminal and dangerous activities," including violations of § 922(d).  S.Rep. No. 98-583, 98th Cong., 2d Sess. 24-25 (August 8, 1984).  Accordingly, any firearm or ammunition "intended to be used" in a violation of § 922(d) was subject to forfeiture both before and after FOPA.

By limiting forfeiture as a matter of law to only the firearms illegally sold, this Court would effectively strike the terms "intended to be used" and "involved in" from § 924(d).  As a practical matter, such a holding would allow the government to forfeit only the firearms that it already owns.  Not only does this create an absurd result (which is to be avoided where possible), it nullifies the terms intended to broaden the scope of the forfeiture provision.  Since those firearms necessarily will have been actually involved in a violation -- and not just intended to have been used -- such a holding would render the quoted terms superfluous.  Courts "should avoid an interpretation of a statute that renders any part of it superfluous and does not give effect to all of the words used by Congress."  *Beisler v. Commissioner of Internal Revenue*, 814 F.2d 1304, 1307 (9th Cir. 1987) (en banc).  In order for the forfeiture provision to have meaning, it must

apply to all of the firearms alleged to have been made available for sale illegally, and that would include the entirety of Boulevard's inventory.

6.   <u>Dismissal of the Amended Complaint at the Pleading Stage Would Be Inconsistent with the Applicable Authority</u>

As noted above, both CAFRA and Rule G contain explicit provisions that discourage the dismissal of civil forfeiture cases at the pleading stage.  Those provisions reinforce the general preference for the determination of judicial cases on the merits.  The judicial authority concerning firearms forfeiture also suggests that dismissal of a case at this early stage is not favored.  To the extent that additional protections are available to gun sellers, those protections are afforded by the heightened burden of proof.  The conclusion to be drawn from the judicial authority in this area is that the determination whether firearms and ammunition are "involved in" or "intended to be used" in a given offense is inherently one of fact and not of law.  "It is well-established that questions of fact cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted."  *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.*, 911 F.2d 242, 245 (9th Cir. 1990)(citing *Rennie & Laughlin, Inc. v. Chrysler Corp.*, 242 F.2d 208, 212 (9th Cir.1957)).  Taking all of the government's factual allegations as true and construing all inferences drawn from those facts in favor of the government, the FAC  portrays rogue firearms dealers who repeatedly and routinely sold firearms and ammunition to convicted felons and others ineligible to purchase them, and then concealed their crimes through the creation of false paperwork and other means.  Claimants' arguments that the FAC alleges only a small number of sales, or that the evidence regarding crime gun traces and pricing are meaningless, do not nullify the allegations.  Those are precisely the kinds of disputes that are properly decided after discovery and trial, not as a matter of law on the pleadings.

24

**C.    Count II Meets the Particularity Requirements of 18 U.S.C. § 924(d)(2)(C) and States a Valid Claim**

Count II alleges that the defendant firearms and ammunition were involved in illegal sales in violation of the GCA, including § 922(d).[12]  The defendant firearms and ammunition were "involved in" the illegal sales, particularly violations of 18 U.S.C. § 922(d), for the same reasons they were "intended to be used" in those sales.  *See*, *e.g.*, *627 Firearms* and *Four Hundred and Seventy-Seven (477) Firearms*.[13]  In addition, the defendant firearms and ammunition were involved in the illegal sales because they facilitated those illegal sales by helping conceal their nature, making it appear that Claimants were legitimate firearms dealers, and attracting felons and other prohibited persons to the stores.[14]

_____

[12]  Specifically, Count II alleges that the defendant firearms and ammunition were involved in one or more violations of 18 U.S.C. §§ 922(b)(2) (disposing of a firearm in violation of state law), 922(b)(3) (transferring a firearm to an out-of-state resident), 922(b)(5) (transferring a firearm without keeping the proper records), 922(d)(1) (disposing of a firearm or ammunition to a felon), 922(g)(1) (aiding and abetting the possession of a firearm by a felon and disposing of ammunition to a felon), and 922(t) (failing to do a background check on the true purchaser).

[13]  As can be seen from the overview of case law above, courts have analyzed forfeitures of entire inventories under both "intended to be used" and "involved in" theories.

[14]  In addition to claiming that Count II does not state a valid claim, Claimants also assert that it should be dismissed because it does not comply with the Court's December 2010 Order.  The Government believes Claimants read the Court's Order too narrowly, but to the extent that the Order does not permit the government to amend the Complaint to add Count II, the government requests that the Order be amended to permit the government to add Count II.  "It is said upon good authority that '(a)n amendment should be allowed where the factual situation is not changed even though a different theory of recovery is presented.'" *Heay v. Phillips*, 201 F.2d 220, 222 (9th Cir. 1952)(quoting *Popovitch v. Kasperlik*, D.C.,76 F.Supp. 233, 238 (D. Pa. 1947)).  Here, despite claimants' protest to the contrary (Memorandum at 24-25), the factual claims that form the basis for Count

Claimants argue -- correctly -- that assets are not forfeitable simply because they are commingled.  However,  the government's theory goes beyond simple commingling, because the commingling (and the falsification of records) served the Claimants' purpose of making the illegal sales much more difficult to detect. *See United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009); *see also United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (forfeiture of commingled legitimate and illegitimate funds is proper if government demonstrates that defendant pooled the funds to facilitate, *i.e.*, disguise the nature and source of, his scheme); *United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999) (citing *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997).  The *Seher* Court ordered the forfeiture of commingled funds on the grounds that such funds were "involved in" money laundering, stating:

> Though the pooling or commingling of tainted and untainted funds would not by itself render the entirety of an account subject to forfeiture, if the government establishes that the defendant did so "'to facilitate or disguise' his illegal scheme," then forfeiture is acceptable.

*Id.*[15]

_____

II are essentially the same as those that form the basis for Count I (indeed, to some extent it is the exact same theory since courts have invoked "intended to be used" and "involved in" interchangeably when discussing forfeiture of entire inventories) and its inclusion does not prejudice claimants.

[15] This interpretation of "involved in" originated under § 981(a)(1)(A) and was based on the legislative history of that section, specifically a statement in the Congressional Record that the term "property involved in" was "intended to include...any property used to facilitate the laundering offense." *Id.*  Although § 924(d) does not have the same specific legislative history, it is appropriate to look to other statutes with similar language when interpreting § 924(d), including § 981(a)(1)(A).  Moreover, although § 981(a)(1)(A) is the only statute that has such specific legislative history, other statutes using "involved in" have been held to include the forfeiture of facilitating property.  For example, the *Seher* Court extended the same interpretation of "involved in" to 31 U.S.C. § 5317.  A similar

1    Here, the defendant firearms and ammunition were used to facilitate or

2    disguise Claimants' illegal scheme.  They made Boulevard appear to be a

3    legitimate firearms and ammunition dealer.  Claimants insisted that all required

4    records be completed by straw purchasers and otherwise falsified records to ensure

5    that such sales appeared legitimate and could be commingled with lawful sales

6    records (to the extent there were lawful sales) to make the illegal sales harder to

7    detect.  *See Seher* 562 F.3d at 1369.

8    Claimants inadvertently support this conclusion, asserting that:

9    ATF has had exclusive custody of Claimants' records and inventory
     since the date of seizure, March 22, 2007, yet those years of
10   opportunity to investigate any further wrongdoing has revealed
     nothing more than the few improper sales, mostly by two store clerks,
11   alleged here.

12   Memorandum at 13.  Setting aside the fact that the government has never

13   suggested that the Amended Complaint describes all of Claimants' illegal

14   activities, ATF's suggested inability to unravel the full extent of Boulevard's

15   illegal sales is the direct result of claimants' extensive efforts at concealment.

16   Their routine sales of firearms to straw purchasers and falsification of records have

17   made it virtually impossible in many instances to sort out which purchases were

18   legitimate and which were not.  For example, ATF attempted to follow up on one

19   of the straw purchases that was captured in the background of a videotaped

20   undercover buy described in the FAC.  When it located the Form 4473 that was

21   most likely connected to that purchase, it discovered that the straw purchaser had

22   been allowed to provide a stolen drivers' license as identification.

23   Having created fictional records of their firearms sales for years, if not

24   decades, Claimants are in no position to complain that ATF cannot show the entire

25   _____

26   reading of § 924(d) is consistent with the broad interpretation given to that section

27   by the Supreme Court, as discussed above, and the decision by Congress to
     provide "for the forfeiture of a weapon even before it had been used."  *Bailey v.*
28   *United States*, 516 U.S. 137, 146 (1995).

extent of their illegal activities.  Indeed, the point of having conducted the illegal firearms sales as straw purchases was to prevent ATF from being able to uncover and detect their illegal scheme.  Nor does any authority require that the government allege *all* of the illegal acts that might support a forfeiture.

**D.   Count III States a Valid Claim**

In discussing the government's § 371 conspiracy theory, Claimants (and the Court, in the December 2010 Order) focus on the record-keeping requirements of the GCA.  *See*, *e.g.,* Order at 21 ("the Complaint fails to allege that *any* of the seized guns were subject to record falsification").  The government's theory, however, is not so narrow.  To state a claim under § 371 for obstructing the operations of a government agency, the government must allege that: (1) there was an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act was committed in furtherance of the conspiracy.  *See United States v. Caldwell*, 989 F.2d 1056, 1058-59 (9th Cir. 1993).  There is no requirement that there be record-keeping provisions with which the conspirators failed to abide.  The conspiracy need have as its purpose the deprivation of property from the government, and neither "the conspiracy's goal nor the means used to achieve it" need to be illegal. *Id.*  Section 371 reaches "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government." *Dennis v. United States*, 384 U.S. 855, 861 (1966)(quoting *Haas v. Henkel*, 216 U.S. 462, 479 (1910)).

The FAC sets out factual allegations that satisfy each of the required elements.  It alleges a conspiracy among the Virgilios, Rabensar and Castellanos, and that the object of that conspiracy was to obstruct ATF in its lawful function of enforcing the GCA.  It alleges that the conspiracy was committed by dishonest means, and that, among other things, (1) Rabensar and the Virgilios lied to ATF regarding their intent to comply with the GCA; (2) the Virgilios lied to ATF about the true nature of their business operations; (3) various co-conspirators instructed

28

1   various purchasers of firearm and ammunition how to prevent law enforcement

2   from discovering the illegal activity; and (4) Claimants and their co-conspirators

3   falsified records to make illegal sales appear legitimate and to make it more

4   difficult for ATF to investigate the sale of any particular weapon.

5       Taken together, the alleged conspiracy to obstruct ATF is wide- ranging,

6   effecting every facet of Claimants' firearms and ammunition business.  Among

7   other things, the defendant firearms and ammunition were used as part of the effort

8   to conceal Claimants' unlawful activities from ATF.  In addition, one of the

9   objectives of the conspiracy was for Claimants to be able to continue to sell the

10  defendant firearms and ammunition to the public by, among other things,

11  Elizabeth Ann and Michael Virgilio secretly operating as an unlicensed

12  partnership and evading either a license revocation or arrest by ATF.  As a result,

13  the FAC sufficiently pleads the elements of a § 371 violation, and that the

14  defendant firearms and ammunition were involved in such violation.

15  **IV.  CONCLUSION**

16      For all of the reasons set out herein, the government respectfully requests

17  that Claimants' motion be denied in its entirety.

18  DATED: April 29, 2010
                              ANDRÉ BIROTTE JR.
19                            United States Attorney

20

                                      /S/
21                            _____
                              STEVEN R. WELK
22                            Assistant United States Attorney
                              Chief, Asset Forfeiture Section

23                            JENNIFER SHASKY CALVERY
                              Chief
24                            PAMELA J. HICKS
                              Senior Trial Attorney
25                            Asset Forfeiture and Money Laundering Section
                              U.S. Department of Justice, Criminal Division
26
                              Attorneys for Plaintiff
27                            United States of America

28